# United States Bankruptcy Court, Northern District of Illinois

| Name of Assigned Judge | Manuel Barbosa | CASE NO. | 10-B-17861 |
|---|---|---|---|
| **DATE** | April 7, 2011 | **ADVERSARY NO.** | 10-A-01268 |
| **CASE TITLE** | Amanda L. Alvis and Mark F. Alvis, Debtors<br><br>Amanda L. Alvis and Mark F. Alvis, Plaintiffs<br><br>v.<br><br>Fox Valley Credit Union, Defendant. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth below, judgment is entered in favor of the Defendant.

■[ For further details see text below.]

## MEMORANDUM OPINION

The Debtors seek a determination that the value of their residence (the "Property") as of the petition date was less than the loan balance secured by the first mortgage held by Fox Valley Credit Union ("Fox Valley"), so that they can treat the claim secured by a second mortgage held by Fox Valley as completely unsecured in their Chapter 13 plan and avoid the second mortgage. The parties did not dispute the balance of the first

mortgage, but they did dispute the value of the residence. The Court held an evidentiary hearing on February 24, 2011, which was essentially a 'battle of the appraisers.' The Debtors' appraiser, Jon Gutstein, presented evidence and testimony that the Property was worth $160,000 as of the petition date. In contrast, Fox Valley's appraiser, Kenneth Embry, presented evidence and testimony that the Property was worth $180,000. The following constitutes the Court's findings of fact and conclusions of law based on the testimony and evidence presented at the February 24th hearing and stipulations of the parties provided in advance of the hearing.

### Findings of Fact

1. The Debtors filed a voluntary petition for protection under Chapter 13 of the Bankruptcy Code with this Court on June 9, 2011.

2. The Property was the Debtors' principal residence as of the petition date.

3. At the time of the petition, Fox Valley held a first mortgage on the Property securing a debt of $173,152.89.

4. At the time of the petition, Fox Valley held a second mortgage on the Property securing a debt of $29,708.83.

5. At the time of the petition, the Property had a value of $175,000.

### Discussion

Under Section 506(a)(1) of the Bankruptcy Code, to the extent a creditor's allowed claim exceeds the value of the collateral securing such claim, after taking into account other creditors' liens that are prior in interest, such portion of its claim is treated as an unsecured claim despite its otherwise valid security interest. In re Ginther, 427 B.R. 450, 452 (Bankr. N.D. Ill. 2010). Section 506(d) states that "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void." 11 U.S.C. §506(d). The Supreme Court has held in Dewsnup v. Timm, 502 U.S. 410, 112 S. Ct. 773 (1992), that Section 506(d) gives no power to void an undersecured lien in the context of a Chapter 7 debtor, but subsequent case law has held that an undersecured lien may be avoided in the context of a Chapter 13 debtor. In re Ginther, 427 B.R. at 452-53 (collecting cases, noting the differing policies underlying Chapter 7 and Chapter 13, and noting limiting language in the Dewsnup opinion). Additionally, Sections 1322(b)(2) and 1327 provide independent authority to modify or avoid a lien through confirmation of a Chapter 13 plan.

However, Section 1322(b)(2) contains an additional restriction where, as here, a debtor seeks to modify a mortgage on the debtor's principal residence. Section 1322(b)(2) states that a plan may not "modify the rights of holders of secured claims ... secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). The Supreme Court has held that one such protected right is the creditor's right to retain its lien until the full debt is paid off. Nobelman v. Am. Sav. Bank, 508 U.S. 324, 329 (1993). Based on the Supreme Court's interpretation of the language of Section 506(a) in Nobelman, so long as the

creditor's mortgage is at least partially secured by equity in the residence, that creditor is a "holder" of a "secured claim" and therefore its right to its lien cannot be modified. Id. 508 U.S. at 329. Nobelman dealt only with a partially undersecured mortgage, but subsequent case law has held that if a mortgage is *completely* undersecured, it *can* be stripped off through a Chapter 13 plan. In re Ginther, 427 B.R. at 455 (collecting cases). Under the same reasoning, if Fox Valley's second mortgage on the Property is only *partially* undersecured, Fox Valley has a secured claim with respect to that claim and will have a right to object to the plan under Section 1325(a)(5) whereas if the second mortgage is completely undersecured the creditor has no such right to object. Therefore, if the Property was worth $173,152.89 or less as of the petition date, Fox Valley's rights in the second mortgage can be modified over its objection and it can be forced to accept less than its full claim, but if the Property was worth even a penny more, its rights are protected.

Section 506(a)(1) provides that, for purposes of the subsection, "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). The Supreme Court has held that, for purposes of the "cramdown" provision in Section 1325(a)(5)(B), where the debtor intends to retain the collateral at issue, "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 960, 117 S. Ct. 1879, 1884 (1997).[1] Since the Debtors apparently intend through their plan to keep the Property, "[t]hat actual use, rather than a foreclosure sale that will not take place, is the proper guide." Id., 520 U.S. at 963.

The parties do not seem to dispute this standard. Both sides' appraisers used a "sales comparison" approach, whereby they selected three or more similar houses in the same area that sold recently, adjusted those sale prices based on material differences from the Property, and averaged the adjusted prices to estimate the price the Property would sell for if appropriately marketed for sale in an arms'-length transaction. Rather than attacking the standard or general methodology, the parties attacked each others' appraiser's choices of comparable sales and the type and extent of adjustments that they made.

The biggest difference between the two appraisals was caused by the lack of recent sales in the area. Because of the general crash in the real estate market since late 2007 and the large number of foreclosures in the area, there were few comparable sales from the preceding 6 months to choose from. To address this difficulty, both appraisers chose imperfect solutions. The Debtors' appraiser chose as his third comparable a house that had sold "as is," meaning that it probably sold out of foreclosure, and might not have sold in an arms'-length transaction. While the Debtors argued that the transaction could have been arms'-length and the existence or option of buying houses at foreclosure sales was relevant because it could affect the price a third party would be willing to pay for the Property, it is hard to believe that the fact that the comparable was sold "as is" did not affect its selling price. This makes it highly suspect as a comparable. In contrast to a hypothetical purchaser of the Property, the purchaser of the foreclosed comparable would have purchased it without any warranties as to

---

[1] Although the Bankruptcy Code was modified post-Rash in 2005 to add a new subsection 506(a)(2) with a more detailed standard for valuation of personal property of individual debtors, the Property at issue in this case is real property and is therefore unaffected by the amendment.

defects in the house, perhaps with no opportunity to view the interior of the house in advance, and with knowledge that the previous owners might have had little incentive to maintain the house or make updates while it was in foreclosure. It is striking that the "as is" comparable was sold for almost $40,000 less than the next closest comparable. Nor did the Debtors' appraiser attempt to make any adjustment based on the nature of the sale, and he gave it an adjusted value of almost $40,000 less than the next closest comparable. Ignoring that comparable and keeping all other assumptions the same, the Debtors' appraisal would increase from $160,000 to $172,750.

Fox Valley's appraiser addressed the lack of recent sales by adding a fourth comparable which was an active listing rather than a closed sale. Mr. Embry testified that this was appropriate under the Uniform Standards of Professional Appraisal Practice, stating that if one of the comparable sales was over 6 months old, the appraiser should use an active listing to supplement the appraisal. Just like foreclosure sales, however, active listings are suspect as an accurate indicator of fair market value or replacement cost. A seller can put anything he or she wishes as a listing price regardless of true value. While a real estate agent is likely to guide a seller to within a reasonable range, they are more likely to err too high than too low, knowing that they can always lower the listing price or to leave room to negotiate if a potential buyer makes a lower offer. There was no evidence presented as to how long the listing was on the market or if the listing price had previously been reduced. As with the Debtors' foreclosure comparable, Fox Valley's listing comparable was outside the range of the other comparables, though not as dramatically. It had an adjusted value of $189,860, approximately $7,500 above the next lowest comparable. Ignoring that comparable and keeping all other assumptions the same, Fox Valley's appraisal would decrease from $180,000 to $177,513.33.

The other major difference is that the Debtors' appraiser made adjustments based on the age of the sale, while Fox Valley's appraiser did not. The Debtor's appraiser had noted that the median sale price in the area had decreased by 9.3% in the 12 months before his appraisal. From this, he extrapolated a 0.78% average monthly decline in housing values in the area. Based on this supposition, he adjusted downwards the value of a comparable property sold 5 months earlier by $5,000 and the value of a comparable property sold 9 months earlier by $10,000. Fox Valley's appraiser argued that such an adjustment for time and market change was speculative and not ordinary. On the other hand, the real estate market of the past three years is hardly ordinary, and it seems difficult to deny that values of the comparables may have decreased in the months before the appraisals. The Court agrees that some form of downward adjustment was appropriate, but feels that the Debtors' appraiser might have over-adjusted. Fox Valley's appraiser testified that he felt the market was stable as of the summer of 2010, presumably having bottomed-out. Therefore, even if the comparable properties had declined in value by 9.3% over the prior twelve months, it was not reasonable to assume that the decline was even over such period. If the market had stabilized by the time of the appraisal, it was more likely that the decline was more rapid in the earlier portion of the 12 months than the latter portion. Thus, Fox Valley's appraisal should be adjusted downwards to reflect market decline for the aged sales, but the Debtors' appraisal should be adjusted upwards slightly for overestimating this effect.

The appraisers also varied in their choice of adjustments, which had a somewhat subjective quality. For example, when making adjustments, Fox Valley's appraiser estimated the value of a deck as $2,500, which he estimated as the cost to build a deck, whereas the Debtors' appraiser estimated the value as $500, which he

estimated as the amount by which a deck would increase the selling price of a home. Fox Valley's appraiser also made more types of adjustments, such as adjusting for the size of the lot and adjusting for the age of the house, which the Debtors' appraiser did not. However, other than the time of sale adjustment discussed above, the overall size and nature of the adjustments was similar, and the Court generally defers to the experts' opinions. But, there is one additional factor that stands out. The Debtors' appraisal indicated that the Debtors' house had a deck, had an additional 42 square feet of living space, and had a finished basement with a half bathroom, all of which Fox Valley's appraiser was apparently unaware. The Debtors' appraiser had full access to the Property and testified that he measured the interior with a tape measure, while Fox Valley's appraiser only had access to the exterior of the house and public records, so the Court believes that the description of features in the Debtors' appraisal was more accurate. Had Fox Valley's appraiser known of these features, that fact would have likely increased his appraisal. For example, in various adjustments, he put the value of a deck at $2,500, put the value of an extra 104 square feet of living space at $1,040, and put the value of a finished basement with a recreation room at $3,000.

Taking all of the above factors in view and the strength of testimony and evidence presented, the Court finds that the value of the house was $175,000 as of the petition date. Since the parties acknowledge that the balance for the first mortgage was only $173,152.89 as of the petition date, that means that the second mortgage was at least partially secured. Therefore, under <u>Nobelman</u>, Fox Valley's rights in its second mortgage cannot be modified by the plan.

### Conclusion

For the foregoing reasons, judgment shall be entered in favor of the Defendant, Fox Valley.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

April 7, 2011

Judge Manuel Barbosa